UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROBERT LAWRENCE HOGAN, JR.,

                                Plaintiff,                          1:07-CV-0731

        vs.

                                                                    (NAM/DRH)

ANTHONY BUTTOFOCCO, Individually and as a
Police Officer for the Village of Green Island; DAVID
SMITH, Individually and as a Police Officer for the
Village of Green Island; CHRIS PARKER, Individually
and as a Sergeant Police Officer for the Village of Green
Island; JOHN NARDONE, Individually and as Chief
Police Officer for the Village of Green Island,[1]

                                Defendants.
_____

**APPEARANCES:**                                   **OF COUNSEL:**

Robert Lawrence Hogan
Plaintiff, *Pro Se*

Smith Sovik Kendrick & Sugnet, P.C.              Edward J. Smith, III
250 South Clinton Street, Suite 600
Syracuse, New York 13202-1252
*Attorneys for Defendants*

**Hon. Norman A. Mordue, Chief U.S. District Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        The present case arises from plaintiff's arrest on August 17, 2006, in the Village of Green

Island, New York for conduct that occurred during an alleged domestic violence incident at his

home, for obstructing police in their investigation of the incident and for resisting arrest.  Plaintiff

sues under 42 U.S.C. § 1983 arguing that the defendants, all police officers employed by the

---

[1] Defendants Ellen McNulty Ryan, Jeffrey Dorrance and Mary/Molly Maguilli were previously dismissed via the Court's Decision and Order dated August 1, 2007.

Village of Green Island, used excessive force in executing his arrest in violation of the Fourth Amendment to the United States Constitution.  Plaintiff also asserts claims under § 1983 for unreasonable search and seizure, false arrest, denial of due process and malicious prosecution. Plaintiff's last federal claim is one for municipal liability on the part of the Village based on *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), though the Court notes that the Village of Green Island is not identified as a defendant in the caption or identifying paragraphs of the complaint.  Finally, plaintiff raises a state law claim for intentional infliction of emotional distress against defendants.  Specifically, plaintiff alleges that defendants caused him to be terminated from his employment after his arrest.  Defendants have moved for summary judgment dismissing the complaint.  Plaintiff, though served with the appropriate notice pursuant to Local Rule 56.2, has not filed papers opposing defendants' motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

According to the evidence submitted by defendants in support of their motion, the facts of this matter are as follows:  At approximately 7:00 p.m., on August 17, 2006, the Village of Green Island Police Department received a 911 call from plaintiff's then ten (10) year old son, Alejandro Noble.  During this call, Noble advised the 911 dispatcher that his mother's "boyfriend" was "wrecking the place at 72" referring to plaintiff's home at 72 Albany Avenue, and "going like crazy."  Noble also told the police dispatcher when asked whether the "boyfriend" had any weapons that he had "a hammer in his hand."

Upon arriving at plaintiff's home, defendant Buttofocco was met outside by plaintiff's son and the complaining witness, Alejandro Noble.  Noble confirmed that he had made the emergency call to police from his grandparents' home next door.  Noble told Officer Buttofocco that his mother, Juanita Ortiz, and his father, plaintiff Hogan, had an argument which turned "physically

2

violent." Noble stated that during the argument, his father flipped over a table in the kitchen and some chairs. Noble also stated that his father turned toward him holding a hammer on his hand, pushed him several times and told him to "Stay the fuck out of our business." At this point, Noble reported that he fled the residence and called police.

When defendant Smith arrived at plaintiff's home as a result of the dispatch call, he and defendant Buttofocco walked to the side entrance of the home and knocked on the door. When plaintiff asked who it was, Buttofocco announced it was the Green Island Police and they wanted to speak to him. According to Buttofocco, plaintiff responded that he would not open the door. After Buttofocco continued knocking on the door and explained that he would like to speak to plaintiff outside, plaintiff finally came to the door, but said he would not come outside or let the officers inside his home. Buttofocco avers that from where he was standing outside the door, he could see that the "house was in complete disarray . . . a table was flipped over and utensils and nick-knacks were strewn all over the floor." Buttofocco also observed two females inside the residence, later identified as Ms. Ortiz and Mr. Hogan's daughter, Ashley, who "seemed very distraught." Finally, Buttofocco noted that plaintiff "was sweating profusely."

Buttofocco again asked plaintiff to come outside and speak with police and when he refused and turned to walk back in the house, Buttofocco states he placed his hand on plaintiff's elbow and told him that he would have to come down to the police station. Officer Buttofocco avers that plaintiff then became "very aggressive . . . and swung his arm" toward the officers. Buttofocco told plaintiff he was under arrest and plaintiff began immediately to resist. Officer Buttofocco grabbed plaintiff about the waist in an attempt to subdue him while Officer Smith tried to gain control of plaintiff's hands. Plaintiff continued to yell and struggle and pull away from the officers. The officers and plaintiff ultimately wrestled their way through the kitchen and

3

into the living room of the home where the three fell onto a wooden table holding a fish tank. Finally, Officer Smith threatened to use his Taser on plaintiff if he continued to resist arrest. After Smith repeated his intent to use the Taser a second time, plaintiff put his arms down and allowed Officer Buttofocco to handcuff him.  Defendants Buttofocco and Smith placed plaintiff under arrest for obstruction of  government administration, harassment and disorderly conduct. After transporting him to the Village of Green Island police department, plaintiff continued to shout profanities and remained uncooperative.  Plaintiff did not complain of any physical injuries and refused medical attention.  Officer Buttofocco telephoned his supervisor, Sergeant Parker, to inform him of plaintiff's arrest and inquire as to how to facilitate his arraignment.

As noted above, plaintiff has not filed papers in opposition to defendants' motion. Plaintiff did, however, testify at a deposition in this matter and the Court has reviewed the transcript of same.  Plaintiff acknowledged that he had a substantial police record, particularly in the Village of Green Island.  He admitted being arrested multiple times for various offenses including assault and harassment.  He had also served time in state prison for robbery and a parole violation.  On the day of his arrest, he had a heated argument with his wife about a check that she cashed in his name.  To wit, some months prior to the incident at issue in this case, plaintiff had injured his ankle in a work-related accident and received a check for approximately $1258.00 from his employer's disability insurance carrier.  His wife Juanita told him the check was for $200.00, signed his name to it and cashed the check at the bank.  While plaintiff was cleaning on the afternoon of his arrest, he found the check stub which showed the actual amount of the insurance payment.  Plaintiff acknowledged that he "confront[ed]" Juanita about the check and where the money had gone.  Plaintiff said he might have used a "loud" voice, or "yelled a couple times, [but] that was it."  He also acknowledged that during the argument, his son Alejandro came

4

over to him and said "Don't worry about the money, that's our money."  Plaintiff testified that in response to Alejandro's interference in the argument he simply said "Alex, do yourself a favor; go outside and play and mind your own business."

Plaintiff denied that the argument between he and his wife was violent or physical.  Indeed, plaintiff said nothing was knocked over or out of place in the house.  Plaintiff believed the defendant officers should have been able to see when he opened the door that everyone in the house was "fine."

Plaintiff admitted that he refused to come out of the house and speak to the defendant officers because he watches the television show "Cops" and was afraid of what the police could do to him outside.  Plaintiff admitted that he was "verbally uncooperative" with the police, and did not become physically uncooperative "until they put their hands on [him] inside the house." When the defendant officers entered the home and tried to take him out, plaintiff acknowledged that he "resisted," "struggled," and "tensed up" so the police could not handcuff him.  Indeed, he testified "When he grabbed ahold [sic] of me I – obviously, I wasn't willing to go out.  You know, I had to be forcefully taken out of my house.  I wasn't going willfully."  When asked what it was that led him not to cooperate with police, plaintiff said "Just by their demand of me to come outside, that was it.  I wasn't going out lying, you know??  I don't know.  It – I seen it all the time on 'Cops' on Channel 23.  You see it on 'Cops' all the time."  It was only after Officer Smith threatened to use his Taser that plaintiff "let him take [his] arms."

Insofar as his claim for excessive force, plaintiff's complaints are that defendant Buttofocco "slammed" him to the ground and never told him why he was being arrested.  Plaintiff said he did not remember defendant Smith "ever touching [him] really."  Plaintiff acknowledged that he did not hit or slam his head when he was pushed to the ground and he suffered no injuries

other than "re-twisting" his previously sprained ankle which was "no big deal" and only caused a "little bit" of pain.  Plaintiff acknowledged that the "nexus" between this incident and some of his previous problems with police is "[his] family."  Indeed, he testified that when he spoke to "Alex" (Alejandro) about why he had made the allegedly unnecessary 911 call to police, Alex said "I just want you out of here."  However, plaintiff was still upset with defendants Buttofocco and Smith because they "took [him] out of [his] house without cause."  To wit, plaintiff testified "[T]he police didn't take any statements.  They didn't do any investigation, they didn't ask any questions, they didn't . . . advise [him] of what they were there, their authority and purpose."  In short, plaintiff believed that defendants did not "follow[] proper police procedures."  While plaintiff agreed that the police should respond to a 911 "distress call" from a child saying his mother was in danger of being injured by her "out-of-control boyfriend," plaintiff said that police should have "asked the parents" about what was really going on instead of taking the word of a "handicapped 13 year old."[2]

Once he was at the police station, plaintiff admitted he was "being an asshole" to Officer Buttofocco because he allegedly had still not told plaintiff what he was arrested for.  However, the Court notes plaintiff must have had some idea that an emergency call to police had prompted his arrest because he admitted asking Buttofocco about where his supervisors were during his arrest: "[Y]ou know, where are they, how come they weren't down there.  **This big, huge, humongous 911 call**, what are they, just out doing nothing?" (emphasis added).  Plaintiff has no complaints about how he was treated once he was in custody.  Plaintiff believes that since his

---

[2] At the time of the incident which is the subject of this lawsuit, plaintiff's son, Alejandro was ten (10) years old.  It is unclear from the record, but the reference to a "13 year old" in all likelihood refers to Alex's age at the time of plaintiff's deposition.  Moreover, it appears from plaintiff's deposition testimony that at least three of his children and/or stepchildren had learning disabilities which the Court believes accounts for his reference to Alex being "handicapped."

employer fired him two days after his arrest and made reference to his encounter with police, Buttofocco must have called plaintiff's place of employment to report his arrest. And although plaintiff alleges that defendant Buttofocco continually left the room to make "little private phone calls," he had no idea of who Buttofocco was talking to or what he was saying.

Plaintiff plead guilty ultimately to a reduced charge of disorderly conduct as a result of his arrest on the date in question. The charges of harassment and obstruction of governmental administration were dismissed. Defendant Buttofocco states that at no time did he place any telephone calls or speak to plaintiff's employer about his arrest. Both Buttofocco and Smith contend that they were required to use reasonable force to restrain and finally arrest plaintiff, but that the force used was not excessive.

## III.   DISCUSSION

A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R.

Civ. P. 56(e).

When the non-moving party " 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." ' *Vermont Teddy Bear Co. v 1-800 Beargram Co.*, 373 F. 3d 241, 244 (2d Cir. 2004) (quoting *Amaker v. Foley*, 274 F. 3d 677, 681 (2d Cir. 2001).  If the movant does not meet its burden of production, then a court must deny summary judgment even if the non-movant does not oppose the motion.  *See id.*  Moreover, the court may not rely solely on the movant's statement of undisputed facts contained in its Rule 56.1 statement.  *See id.*  The court must be satisfied that the movant's assertions are supported by the evidence in the record.  *See id.* (citing *Giannullo v. City of New York*, 322 F. 3d 139, 140 (2d Cir. 2003)).  When a nonmoving *pro se* party has failed to submit papers in opposition to a motion for summary judgment, summary judgment may be granted as long as the court is satisfied that the undisputed facts "show that the moving party is entitled to a judgment as a matter of law," and plaintiff has received notice that failure to submit evidence in opposition may result in dismissal of his or her case.  *Champion v. Artuz*, 76 F. 3d 483, 486 (2d Cir. 1996).

B.      Substantive Legal Standard

Plaintiff bases his federal claims on 42 U.S.C. § 1983, which reads in part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage of any State ..., subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action.

Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)

(quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, (1979)).

C.      Warrantless Search and Seizure

  The Fourth Amendment's warrant requirement protects one's privacy interest in home or property against unreasonable search and seizure.  As such, warrantless searches inside a home are presumptively unreasonable.  *Payton v. New York*, 445 U.S. 573, 586 (1980).  Absent exigent circumstances or some other exception, the police must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy.  *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999).  "Police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance."  *Tierney v. Davidson*, 133 F. 3d 189 (2d Cir. 1998) (citing *Root v. Gauper*, 438 F.2d 361, 364 (8th Cir. 1971); *see also Minnesota v. Olson*, 495 U.S. 91, 100 (1990); *United States v. MacDonald*, 916 F.2d 766, 770 (2d Cir. 1990) (en banc); *United States v. Gallo-Roman*, 816 F.2d 76, 79 (2d Cir. 1987).  Courts must apply an objective standard to determine the reasonableness of the officer's belief.  *See Mincey v. Arizona*, 437 U.S. 385, 392 (1978) ("Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.").  However, "[t]his requirement . . . must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences."  *Tierney*, 133 F.3d at 197 (quoting 3 Wayne LaFave, Search and Seizure § 6.6(a), at 391 (3d ed.1996)).

  The defendant police officers in this case assert that they were dispatched to plaintiff's residence because of a domestic dispute involving a child's mother and her "out-of-control"

boyfriend who was armed with a hammer.  Upon arrival at plaintiff's home, defendant Buttofocco confirmed the details provided to the 911 dispatcher by Alejandro Noble and learned additional information including the fact that plaintiff had allegedly knocked over a kitchen table and shoved Noble numerous times.  When plaintiff answered the door, the defendant officers observed two females in the residence with plaintiff, one of whom was another child.  Plaintiff admits that he adamantly refused to go outside and speak to police and that he began forcefully to resist when Buttofocco took his arm and advised him he would have to come down to the police station.  Even assuming the truth of plaintiff's assertions that nothing was in disarray in his home and that everyone was "fine" inside, it was reasonable for police to believe plaintiff's wife and/or daughter might be in danger of physical harm given the nature of the information provided by Alejandro Noble.  Furthermore, it was reasonable for the defendant officers to ask plaintiff to step outside and answer questions about the alleged domestic situation and his refusal to do so justified their decision to arrest him.  The Court finds that the information provided to police in the 911 call, combined with the additional information obtained from Alejandro Noble upon arrival at plaintiff's home and plaintiff's defiant and combative attitude toward the police supports defendants' contention that their warrantless entry into plaintiff's home occurred under exigent and therefore justified circumstances.

D.    Underline False Arrest

Under New York and federal law, "probable cause serves as a complete defense to the charges of false arrest and malicious prosecution."  *See Zanghi v. Incorporated Village of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985).  "Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."

*Singer v. Fulton County Sheriff*, 63 F. 3d 110, 119 (2d Cir. 1995); accord *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).  In evaluating probable cause, courts consider the facts available to the officer at the time of the arrest.  *Martinez v. Simonetti*, 202 F. 3d 625, 634 (2d Cir. 2000); *Lowth v. Town of Cheektowaga*, 82 F. 3d 563, 569 (2d Cir. 1996); *see also Broughton v. State of New York*, 37 N.Y.2d 451, 458 (1975).  Moreover, it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth.  *See Daniels v. United States*, 393 F.2d Cir. 359, 361 (D.C. Cir. 1968).  The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed.  *See Adams v. Williams*, 407 U.S. 143, 146-47 (1972).[3]

In this case, plaintiff was arrested for obstruction of government administration ("OGA") in violation of New York Penal Law § 195.05, harassment in the second degree in violation of New York Penal Law § 240.26, and resisting arrest in violation of New York Penal Law § 205.30.

A person is guilty of OGA when:

> he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . .

N.Y. Penal Law § 195.05.  A person is guilty of harassment in the second degree when:

---

[3] While ordinarily the probable cause requirement is met where the arresting officer has been advised of a crime by a person who claims to be the victim, *see Singer*, 63 F. 3d 119, it has been held that "[s]ometimes information from or about a person claiming to be the victim of crime would lead a reasonable officer to be suspicious, making further investigation prudent--and, because the 'reasonableness' standard of the fourth amendment links the constitutional obligation to the standard of prudent conduct, the officer must do more." *Hebron v. Touhy*, 18 F.3d 421, 422-23 (7th Cir. 1994).  The officer is not, however, required to "make a full investigation into [a suspect's] state of mind prior to taking action" or to "explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).

with intent to harass, annoy or alarm another person:

> 1. He or she strikes, shoves, kicks or otherwise subjects such other
> person to physical contact, or attempts or threatens to do the same; or
>
> 2. He or she follows a person in or about a public place or places; or
>
> 3. He or she engages in a course of conduct or repeatedly commits acts
> which alarm or seriously annoy such other person and which serve no
> legitimate purpose.

N.Y. Penal Law § 240.26.  A person is guilty of resisting arrest "when he intentionally prevents

or attempts to prevent a police officer or peace officer from effecting an authorized arrest of

himself or another person."  N.Y. Penal Law § 205.30.

Nothing in plaintiff's deposition testimony contradicts defendants' assertions that they

were called to his home as a result of a distress call to 911 by his son, that police were informed

plaintiff was "going like crazy" in an argument with Alejandro Noble's mother and that plaintiff

was armed with a hammer.  Even assuming the truth of plaintiff's allegations concerning the

"peaceful" nature of his argument with his wife and the absence of physical harm or threats to

anyone in his home, the police were justified in attempting to speak to plaintiff concerning the

matter.  His undisputed combative attitude and refusal to cooperate with police did nothing to

allay: 1) the defendant officers' belief that the alleged domestic dispute involving physical

violence and potential use of a weapon inside the home implicated plaintiff in the crime of

harassment or worse; and 2) defendants' concern for the physical safety of the two females inside

plaintiff's home.  Thus, the Court finds that defendants Buttofocco and Smith had probable cause

to arrest plaintiff for harassment and OGA after he refused to speak with them in their

investigation of Alejandro Noble's complaint.  Moreover, plaintiff readily admits that he resisted

arrest because he believed *inter alia*, that the defendant officers should have asked more

questions, been suspicious of his "handicapped' son's statement and/or otherwise informed him of the nature of their investigation before they took him into custody.  It is well-settled, however, that police are under no obligation to undertake any of the above-referenced actions once probable cause exists to arrest.  Plaintiff has failed to raise any triable issue concerning the absence of probable cause for his arrest on the date in question for the three charged offenses. Consequently, defendants' motion for summary judgment on plaintiff's claim for false arrest must be granted.

E.      Malicious Prosecution

        To recover on a malicious prosecution claim under New York law, a plaintiff must prove four elements: (1) that the defendant either commenced or continued a criminal proceeding against plaintiff; (2) that the criminal proceeding terminated in plaintiff's favor; (3) that there was no probable cause for the criminal proceedings; and (4) that the criminal proceeding was instituted in actual malice.  *See Broughton*, 37 N.Y.2d at 457; *Russo v. State of New York*, 672 F.2d 1014, 1019 (2d Cir. 1982).  The Court notes that two of the three involved charges against plaintiff in this case were dismissed outright and he pled guilty to a lesser crime on the charge of resisting arrest.  Thus, the disposition of at least two of the criminal charges against plaintiff in this case constitutes "favorable termination" for the purpose of plaintiff's malicious prosecution claims.  Establishing  "favorable termination" status, however, does not cure plaintiff's failure to demonstrate the absence of probable cause for the criminal proceedings against him in the first instance.  As discussed at length above, there are no triable issues concerning the objective existence of probable cause to support plaintiff's arrest on three criminal charges.  Further, the Court can discern no evidence of malice on the part of defendants in reviewing the present record. Therefore, an award of summary judgment against plaintiff on his claims of malicious

prosecution is warranted.

F.     Excessive Force/Denial of Due Process

Plaintiff claims that defendants violated his constitutional rights because they used excessive force in executing his arrest.  "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons ... against unreasonable ... seizures' of the person.  *Graham*, 490 U.S. at 393-94.  Thus, it is now well-settled that all claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.  *Id.* (citing, *e.g. Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir.) *cert. denied* 414 U.S. 1033 (1973)).  "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."  *Id.*  Because plaintiff's claim for denial of due process is thus characterized properly as one alleging the use of excessive force, the Court must dismiss the former and analyze the latter under the tenets of the Fourth Amendment.

Defendants move to dismiss plaintiff's excessive use of force claim on the ground that any force used against plaintiff in executing his arrest was necessary and appropriate under 42 U.S.C. § 1983.

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. . . . **[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some**

> **degree of physical coercion or threat thereof to effect it.**  Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, **whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.**

*Graham*, 490 U.S. at 396 (internal citations omitted) (emphasis added).  Courts are required to view excessive force claims under the long-established principle that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  *See Terry v. Ohio*, 392 U.S. 1, 20-22 (1968).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" is actionable under the Fourth Amendment.  *Johnson,* 481 F.2d Cir. at 1033.  Analysis of reasonableness of force used "must embody . . . the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 397.

In the present case, it is undisputed that defendants had probable cause to arrest plaintiff and that plaintiff resisted forcefully while being taken into custody.  Moreover, plaintiff admits that he sustained no serious injuries in the complained of "take down."  He stated that "re-twist[ing]" his ankle was "no big deal," and that his real beef with defendants arose from their failure to follow what he deemed "proper police procedures."  Indeed, it is clear from review of his deposition testimony that plaintiff believes: 1) he should have been offered more information by the police; and 2) that the defendant officers should have conducted more of an investigation of the circumstances surrounding the alleged "loud" but peaceful argument which precipitated his son's call to 911.  The record, however, viewed in the light most favorable to plaintiff, amply supports the actions of defendants Buttofocco and Smith.  To wit, plaintiff admits that he was

involved in a heated argument with his wife, he does not dispute the content of his son's frantic call to police, and plaintiff also acknowledges that he was uncooperative with police when they arrived at his home.  Plaintiff concedes that he would not step outside to speak to the defendant officers and that when they elected therefore to take him into custody for further questioning, he refused to be handcuffed or subdued.  From an objective point of view, the defendant officers had an entirely reasonable belief that plaintiff had committed or could commit an act of harassment and/or assault against his wife, his son Alejandro or the young child still present in the home. Plaintiff's absolute refusal to step outside his home and answer questions about the alleged domestic disturbance, thus dispelling concerns by police that any laws had been or could be broken, provided  grounds for his arrest.

The disputed facts as between the parties herein - such as the nature of the dispute plaintiff was having with his wife, whether it had been or became physical and whether the house was in visible disarray when the defendant police officers arrived are immaterial under Fed. R. Civ. P. 56.  Even assuming the truth of plaintiff's assertions on the above matters, they fail to raise any question on the issue whether defendants used excessive force in placing plaintiff under arrest. Thus, summary judgment is appropriate on plaintiff's excessive force claim.

F.      Qualified Immunity

Even if the above were not true, both Officers Buttofocco and Smith are also protected against plaintiff's various § 1983 claims by qualified immunity.  As noted recently in the Supreme Court case of *Pearson v. Callahan*,--- U.S.----, 129 S.Ct. 808, 815 (2009):

> The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity balances two important interests--the need to hold public officials accountable when they

16

> exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting) (citing *Butz v. Economou*, 438 U.S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

For example, in cases of alleged false arrest, objective reasonableness does not turn on whether probable cause in fact existed.  *See Martin v. Malhoyt*, 830 F.2d 237, 263 (D.C. Cir. 1987). Rather, objective reasonableness can exist if it is shown  "either (a) that it was objectively reasonable for the officer to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether the probable cause test was met." *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987) (citations omitted).  Summary judgment on the basis of qualified immunity is appropriate where the only conclusion a rational jury could reach is that under the circumstances it was objectively reasonable for the officer to believe there was probable cause to make the arrest or that reasonably competent police officers could disagree about the legality of the arrest.  *See Ricciuti v. New York City Transit Auth.*, 124 F. 3d 123, 128 (2d Cir. 1997); *Lennon v. Miller*, 66 F. 3d 416, 421 (2d Cir. 1995).

Further, as referenced above, excessive force claims are properly analyzed under the Fourth Amendment's "objective reasonableness standard," because of the uncertainty and rapidity inherent in police work. *Graham*, 490 U.S. at 396.  Indeed, *Graham* sets forth a list of factors relevant to the merits of the constitutional excessive force claim which include analysis of the crime at issue, the threat posed by a suspect and any attempt by the suspect to evade or resist arrest.  *See id.*  If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.  *See*

17

*id.*  "[T]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."  *Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled on other grounds*, *Pearson, supra*:

> It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.*  Indeed:

> [O]fficers can  have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution.  Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* [*v. Creighton*, 483 U.S. 635 (1987)] still operates to grant officers immunity for reasonable mistakes as to the legality of their actions.

*Id.* at 206 (emphasis added).

Having been dispatched to plaintiff's home based on the information supplied by plaintiff's son, and after obtaining additional details concerning the nature of the alleged domestic dispute which occurred or was underway in plaintiff's home, and finally, upon plaintiff's admitted refusal to cooperate with police orders to step outside and answer questions, the defendant police officers had sufficient grounds to believe reasonably that plaintiff should be arrested and charged with various crimes.  As a further matter, plaintiff's uncontroverted refusal to be handcuffed, taken into custody and/or removed from his home provided a reasonable basis for Officers Buttofocco and Smith to conclude that some degree of physical force was necessary to subdue and gain physical control over their suspect.  In the circumstances presented to these defendant officers, neither plaintiff or the Court has identified a case demonstrating a clearly

established rule prohibiting police from acting as they did in this case.  *See Saucier, supra*, 533

U.S. at 208.  At the very least, defendants Buttofocco and Smith have established that reasonably

competent police officers could disagree on the questions of probable cause and excessive force

in this case.   The Court's conclusion in this regard is confirmed by the "uncontested fact that the

force was not so excessive that [defendant] suffered hurt or injury." *Id.*

Based thereupon, the motion by defendants to dismiss plaintiff's claims for unreasonable

search and seizure, excessive force, false arrest and malicious prosecution on the alternative

ground of qualified immunity must be granted.

G.    Claims Against Defendants Nardone and Parker

The law is clear that personal involvement is a prerequisite to an award of damages

against an individual defendant in an action arising under 42 U.S.C. § 1983.  *See Williams v.*

*Smith,* 781 F.2d 319, 323 (2d Cir. 1986).  Individuals are liable under § 1983 in their personal

capacity only if they were personally responsible for violating a plaintiff's rights or promulgated

unconstitutional policies or plans or otherwise authorized or approved misconduct under

circumstances indicating deliberate indifference.  *See id.*; *see also Rizzo v. Goode,* 423 U.S. 362,

371 (1976); *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir. 1989); *Duchesne v. Sugarman,*

566 F.2d 817, 831 (2d Cir. 1977).

In the present case, defendants Nardone and Smith contend that plaintiff makes no factual

averments demonstrating what, if anything, they did personally in furtherance of violating

plaintiff's constitutional rights or failing to prevent the other named defendants from allegedly

doing so.  The Court agrees and thus must grant the motion by defendants Nardone and Smith for

summary judgment on plaintiff's claims against them.

H.    Municipal Liability Against Village of Green Island

To the extent that plaintiff's *pro se* complaint is deemed to contain a claim against the Village of Green Island and/or its police department, the Court finds it does not meet the criteria set forth in *Monell, supra*, because he does not establish any incidents of substantive fact outside of his arrest and prosecution to demonstrate a municipal policy or custom which resulted in alleged constitutional violations.  Review of the complaint does not reveal the alleged municipal policy at the heart of plaintiff's *Monell* claim.  Indeed, plaintiff simply alleges that he holds the Village "personally liable" for the actions of defendants Buttofocco and Smith.

In *Monell*, the Supreme Court reviewed the legislative history of  42 U.S.C. § 1983 and concluded that Congress did not intend to impose broad liability on municipalities.  *See* 436 U.S. at 690.  Thus, under § 1983, a municipality may not be held liable for the acts of its employees based solely on a theory of *respondeat superior*.  *See Monell*, 436 U.S. at 690-91.  It is only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights that it is liable for the injury.  *See id.* at 692.  Moreover, it is necessary that the policy or custom be made by one "whose edicts or acts may be said to fairly represent official policy." *Id.* at 694.  Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the unlawful action of which a plaintiff complains. *See Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986).  Finally, to establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *See Monell*, 436 U.S. at 692.

Plaintiff having failed to plead or prove the existence or involvement of an unconstitutional municipal policy in this case, his *Monell* claim must be dismissed.

I.    Intentional Infliction of Emotional Distress

As a broad principle, recovery may be had for the intentional infliction of emotional

20

distress where "one who, without just cause or excuse, and beyond all bounds of decency, purposely causes a disturbance of another's mental and emotional tranquility of so acute a nature that harmful physical consequences might be not unlikely to result . . . even though no demonstrable physical consequences actually ensue." *Green v. Leibowitz*, 118 A.D.2d 756, 757 (2d Dep't 1986) (citations and internal quotation marks omitted).  Under New York law, in order to establish such a claim, a plaintiff must allege: "(I) extreme and outrageous conduct;  (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress;  (iii) a causal connection between the conduct and injury, and (iv) severe emotional distress." *Howell v. New York Post Co., Inc*., 81 N.Y.2d 115, 122 (1993).  The gravamen of a cause of action for the intentional infliction of emotional distress is that the conduct complained of "is especially calculated to cause, and does cause, mental distress of a very serious kind." *Green*, 118 A.D.2d at 757 (citing Prosser and Keeton, Torts § 12, p. 60 [5th ed], and cases cited therein).

The Court reserves no doubt that given his rather extensive dealings with police in the Village of Green Island and his self-described efforts to reform his criminal behavior, plaintiff's indignation at the arrival of the police when he believed he was merely involved in a "peaceful" argument with his wife was genuine.  Nevertheless, plaintiff's admissions concerning his obstinate conduct in the face of police orders are fatal to his claim that defendants Buttofocco and Smith simply "bum rushed" him and took him out of his home "without cause."  Plaintiff has cited no act or failure to act by defendants Buttofocco and/or Smith which could be viewed by any reasonable person as inconsistent with the duties and responsibilities of law enforcement officers.  Thus, plaintiff's allegations against the defendant police officers do not rise to the level of conduct contemplated by the tort of intentional infliction of emotional distress.  *See Howell*, 81 N.Y.2d at 123 ("Indeed, of the intentional infliction of emotional distress claims considered by

this Court, every one has failed because the alleged conduct was not sufficiently outrageous . . .

Liability has been found only where the conduct has been so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community." (citations and internal quotation

marks omitted)).

**IV.    CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that the motion by defendants for summary judgment dismissing the

complaint is GRANTED.

IT IS SO ORDERED.

Dated: September 28, 2009
         Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge

22